UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DWAYNE ALMOND,

        Plaintiff,

v.                                           Case No. 14-cv-901-pp

WILLIAM POLLARD, DR. BAIRD,
DR. ENDRES, DR. JOHNSON,
DR. LUDVEGSON, N. KAMPHUIS,
MR. NESBIT, WELCOME ROSE,
CHARLES FACKTOR, MATTHEW FRANK, and
KAREN GOURLIE,

        Defendants.

---

**DECISION AND ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION, DEFENDANTS' MOTION TO STAY DISCOVERY AND DEADLINES, PLAINTIFF'S TWO MOTIONS FOR INJUNCTIVE RELIEF, PLAINTIFF'S THREE MOTIONS TO COMPEL, PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF'S MOTION CALLING FACTS TO THE COURT'S ATTENTION**

---

The plaintiff is a *pro se* prisoner incarcerated at the Waupun Correctional Institution (WCI). On November 14, 2014, Magistrate Judge William E. Callahan granted the plaintiff's motion for leave to proceed *in forma pauperis*.[1] On December 29, 2014, the Clerk of Court reassigned the case to this court. The defendants have filed a motion for reconsideration of Judge Callahan's order granting the plaintiff's motion for leave to proceed *in forma pauperis*, as well as a motion to stay discovery and deadlines. The plaintiff has filed two

---

[1] Although the plaintiff had accumulated three "strikes" because courts have dismissed three of his previous cases for failure to state a claim, in his November 14 order, Judge Callahan concluded that the plaintiff could proceed *in forma pauperis* under the imminent danger exception of the Prison Litigation Reform Act's three-strikes rules because the complaint alleged that he is under imminent danger of serious physical injury. *See* 28 U.S.C. § 1915(g)

1

motions for injunctive relief, three motions to compel, a motion for summary judgment, and a motion for court order. The court will address the motions in this order.

## Defendants' Motions

A. <u>Defendants' Motion to Reconsider The Grant of *In Forma Pauperis* Status</u>

On February 26, 2015, the defendants filed a motion asking the court to reconsider Magistrate Judge Callahan's order granting the plaintiff's petition to proceed *in forma pauperis* (ECF No. 30). After recounting the law holding that a plaintiff with three frivolous lawsuit "strikes" against him may proceed *in forma pauperis* only after making specific and credible allegations that he is under imminent danger of serious physical injury, the defendants argue that the plaintiff has four "strikes" against him. They contend that the plaintiff's vague allegations in his complaint that the defendants have failed to treat him for his serious mental health issue do not establish that the plaintiff is under imminent danger of serious physical injury, such that Judge Callahan was justified in permitting him to proceed under the imminent danger exception to the three-strikes rule. The defendants also argue that the plaintiff's allegations of imminent danger are not credible. They assert that their attached affidavits and exhibits demonstrate that the plaintiff is not in danger of physical harm as a result of not receiving psychiatric care.

According to the defendants,

> 6. In early November, 2013 Dr. Endres, a defendant herein, advised inmate Almond she would make contact with him within a 5-week period. (Baird Aff. ¶ 5, Exh. B at PSU 6.) Inmate Almond was in the general population when he submitted his request but

2

was placed in segregation (SEG) on December 12, 2013. Dr. Endres attempted to interview Almond during SEG Clinical Rounds on December 16, 2013. Almond appeared to be sleeping and did not respond to Dr. Endres's attempts to engage him. Dr. Endres attempted twice more to interview inmate Almond, on December 26, 2013 and January 6, 2014. On the latter two occasions, Almond was awake, appeared to be writing something, and would not respond to Dr. Endres' attempts to engage. (Id., Ex. B at PSU 4 – 5.)

7. Thereafter, Almond refused contact with WCI's health and psychological services staff six times:

    a. March 24, 2014: Upon being approached by PSU staff during psychological rounds, Almond yelled, "I'm busy!" without looking up.
    b. April 14, 2014: Almond did not respond to psychological rounds, but was awake and was doing some sort of paperwork.
    c. April 28, 2014: Upon being approached by PSU staff during psychological rounds, Almond yelled, "Get the fuck away from my door!"
    d. May 5, 2014: Upon being approached by PSU staff during psychological rounds, Almond yelled, "Get the fuck away from my door!"
    e. May 12, 2014: Upon being approached by PSU staff during psychological rounds, Almond yelled various obscenities in response to being asked if there was anything he wished to discuss.
    f. May 19, 2014: Upon being approached by PSU staff during psychological rounds, Almond had a not on his door stating he did not want to speak with PSU. (Id., Ex. B at PSU 4 – 5.)

8. PSU staff noted no signs of injury or illness during any of the above mentioned encounters. (*Id.*)

9. Almond's PSU records indicate that PSU staff checked in on Almond twelve times between June 9, 2014 and December 10, 2014. PSU staff noted no signs of injury or illness during any of the encounters with Almond between June 9, 2014 and December 10, 2014. (*Id.*)

10. WCI Psychological services staff spoke with Almond on October 14, 2014. The mental status report indicates Almond did not report difficulties with appetite or sleep, and he denied current

3

suicidal or homicidal ideations, plan, or intent. The clinical contact form did not note any signs of past, current, or potential future physical harm stemming from Almond's lack of psychotropic medication. (*Id.*, Ex. B at PSU 3.)

      11. Almond's psychiatric report as of November 24, 2014 indicates that he is not a danger to himself or others and that his symptoms are not consistent with psychotic illness. The November 24 report states that Almond reported that prison staff mentally and physically abuse him, and that when he gets angry he punches the wall or his bed. Almond did not report any specific incident of self-harm, denies the voices in his head tell him to harm others, denies thoughts of harming others, and denies current thoughts or plans to harm himself. (Schrubbe Aff. ¶ 5, Ex. C at HSU 8-9.)

      12. Almond's medical records from the 2014 calendar year note numerous contacts with WCI's Health Services Unit, none of which involve self-inflicted harm, illness or harm indicative of mental or physical abuse, or harm related to any psychological condition. (*Id.*, Ex. C.)

(ECF No. 30 ¶¶ 6-12.)

The plaintiff opposes the defendants' motion to reconsider. He responds that the complaint sufficiently alleges imminent danger, and he disputes the defendants' assertions that he has received treatment for his mental illnesses. The plaintiff cites to a 2005 Psychiatric Report where Dr. Callister stated that the plaintiff reported that he ate his feces on several occasions. (ECF No. 37-1 at 6.) He also asserts that that he punched his cell wall. The plaintiff states that Dr. Endres did not attempt to interview him on December 16, 2013. (ECF No. 37 at 9.) He further states that he never stated that he did not want to speak with PSU between March 24 and May 19, 2014. (ECF No. 37 at 9.)

4

The plaintiff refers to Dr. Callister's Psychiatric Report from his November 24, 2014, appointment with the doctor. The court will quote at length from that report.

NARRATIVE

The patient was seen in a scheduled appointment after being referred by clinical services for possible depression.

The patient report a history of "schizophrenia" going back many years to treatment in the community. He says that he is not depressed but instead plagued by "voices" and "seeing things." He says he hears voices "in my head," which are both male and female, and tell him to do things such as eat his feces or to harm himself. He says these voices have always been with him but have been helped by medications such as haloperidol or quetiapine. He has also taken chlorpromazine in the past. He initially tells me that the Department of Corrections stopped his medications while he was at Green Bay but later tells me that he stopped them on his own. He is asking to be placed back on medications that he says help him with his voices.

The voices do not tell him to harm others. He feels the voices are worse recently because he is "mentally and physically" abused by staff. He gets angry with staff but denies any thoughts of harming others. When he gets angry, he punches the wall or punches his bed. He denies any current thoughts or plans to harm himself.

The "hallucinations" he sees consist of "clown faces" that appear at the end of his bed. Although he realizes they are hallucinations and "part of (his) mental illness," they still frighten him sometimes. He finds it hard to sleep because the voices bother him all night long.

When he is in general population, he does leave his cell on pass. He denies feeling depressed but instead says he is "distressed." He does not report any problems with his appetite or energy level.

What he describes is a situation in which he is frequently misunderstood. For instance, he gets into arguments with cellmates because he is struggling with voices in his head and they think he is talking to them (his cellmate). This later escalates into a fight. He has similar problems with staff, and he says that he is

5

simply misunderstood for having a mental illness. This has caused problems in the community as well, and he says that he was revoked because his probation agent arrived at his apartment and found him holding a butcher knife. He says he was thinking of killing himself because of the voices, but he was incarcerated and later revoked because his probation agent said he was being threatening. In all the examples he gives, he describes a situation in which he was responding to his "mental illness," and this was misunderstood as aggressive behavior on his part.

He has children in the community. He has never been involved in a long-term relationship. He was receiving social security benefits and not working in the community but had his own apartment. He was being treated by case management services in Milwaukee. He says he has had a relationship with one of his probations agents in the past.

CURRENT MEDICATION
None.

MENTAL STATUS EXAMINATION
He is alert, well-groomed, and fully oriented. He wears fashionable glasses. He smiles and behaves in a flirtatious (but not outwardly inappropriate) manner with the female officer who escorts him. I asked her to stand outside the door, and he smiled and somewhat playfully told her she could stay in the room with us. Speech is of normal rate and volume without pressure. Mood is "distressed." Affect shows appropriate range and reactivity. Thought process is linear, logical, and goal-orientated. Thoughts are focused on wanting to obtain medication to treat his reported symptoms. He denies thoughts of wanting to harm himself or others. No internal preoccupation is evident. No abnormal movements are noted. No delusions are expressed. Insight is fair and judgment fair. Cognition is grossly intact.

IMPRESSION
During this interaction, the patient does not present with what I believe is a psychotic illness. He describes atypical hallucinations and also describes an awareness that what he is experiencing is part of a "mental illness," which would be very unusual in a chronic psychotic illness. He also presents his reported symptoms in a way that exempts him from responsibility for his actions. For instance, he was revoked because, as he describes it, he was misunderstood when he was responding to reported symptoms, and he has a history of being placed in segregation because he is misunderstood for responding to

6

reported symptoms of mental illness. He also denies any
symptoms consistent with a mood disorder and his full affect
would support that he does not have a mood disorder or chronic
psychotic illness. I told him I would like to obtain past treatment
records and had no medication recommendations at this time.

DIAGNOSIS
History of personality disorder with narcissistic and
antisocial features.

TREATMENT PLAN
1. We will obtain outpatient treatment records.
2. I will send a brief email to clinical services regarding my findings
and impression.

(ECF No. 34-1 at 8-9.)

As an initial matter, the court notes that the Federal Rules of Civil Procedure do not provide for a "motion to reconsider." Rule 59 allows a part to ask for a new trial, or the alteration or amendment of a judgment, under crtain circumstances. Rule 60 allows a party to ask for relief from a judgment or order, but only under specific circumstances. The defendants have not cited to Rule 60, or demonstrated that any of the bases for Rule 60 relief exist here.

Even if the rules did provide for general "reconsideration," this court will not reverse Magistrate Judge Callahan's decision, based upon the information he had before him at the time he made that decision, that the allegations in the complete were sufficient to allege imminent danger of serious physical injury, justifying an exception the three-strikes rule. *See* 28 U.S.C. § 1915(g). All that Judge Callahan had before him when he made his decision on November 1, 2014 was the plaintiff's complaint. That complaint alleged that the defendants were failing to treat the plaintiff's serious mental health needs, including "paranoid-type schizoaffective disorder." The Seventh Circuit has held that a

7

court considering whether a three-strikes plaintiff has met §1915(g)'s imminent danger exception should not attempt to evaluate the seriousness of plaintiff's claims. *Taylor v. Watkins*, 623 F.3d 483, 485 (7th Cir. 2010) As long as a plaintiff alleges that he is under imminent danger of serious physical injury (and the allegations are not "conclusory or ridiculous," and they do not concern only past injuries), the court should grant the *in forma pauperis* petition. *See id.* Judge Callahan had such allegations before him, and under *Taylor v. Watkins*, did not err in making his decision without digging more deeply into the allegations in the complaint.

Since Judge Callahan's November 14, 2014 decision, however, the defendants have produced evidence disputing the plaintiff's allegations of imminent physical danger. The Seventh Circuit also has held that when a defendant contests a plaintiff's imminent danger claim, as the defendants now have done, the court should assess the credibility of the allegations of imminent physical harm, either by relying on affidavits or depositions or by holding a hearing. *See id.* (citing *Gibbs v. Roman*, 116 F.3d 83, 86-87 (3d Cir 1997)). The evidence submitted, both by the defendants in the attachments to the February 26, 2015 motion to reconsider, and by the plaintiff in his March 3, 2015 brief in opposition to the motion, do not support the plaintiff's allegations that he is under imminent danger of serious physical injury. That evidence indicates that that prison staff and medical professionals are monitoring and evaluating the plaintiff's condition (even if the court takes as

8

true for the purposes of this order that the plaintiff's assertions that certain encounters with staff did not take place).

Based on this new evidence, this court will revoke the grant of authority to proceed *in forma pauperis*. The plaintiff must pay the full filing by June 1, 2015, or the court will dismiss this case.

B. <u>The Defendants' Motion to Stay Discovery</u>

On February 26, 2015, the defendants filed a motion to stay discovery and deadlines pending the court's decision on their motion to reconsider (ECF No. 36). While the court will not grant the motion to reconsider, the information attached to that motion has, as discussed above, caused the court to revoke the granting of the authority to proceed *in forma pauperis*, and this order will require the plaintiff to pay the full filing fee by June 1, 2015. As a result, the court will grant the defendants' motion to stay discovery until the plaintiff pays the filing fee. If the plaintiff pays the filing fee by June 1, the court will issue a new discovery schedule.

**Plaintiff's Motions**

A. <u>The Plaintiff's Motions for Injunctive Relief</u>

On December 22, 2014, the plaintiff filed a motion requesting the court to provide him with "federal protection special placement," with regard to another inmate who the plaintiff alleged had threatened him (ECF No. 18). According to the December 22 motion, in 2009 inmate Davonte Love told the plaintiff about Love's sexual assault case. In 2014, the plaintiff sent an affidavit to the Milwaukee County District Attorney's Office regarding Mr. Love's

9

sexual assault case. As a result, the plaintiff alleged, Mr. Love has threatened to kill the plaintiff. The plaintiff alleged that he and Mr. Love had been confined in the same unit at times. The plaintiff asked for the "federal protection special placement," to save his life.

On January 5, 2015, the plaintiff filed a motion asking the court to impose an emergency preliminary injunction related to the deprivation of mental health care (ECF No. 20). According to the plaintiff, the defendants had failed to treat his mental illness. He sought a court order transferring him to an institution that would treat his mental illness, such as the Wisconsin Resource Center. The plaintiff also alleged that on November 24, 2014, he met with WCI psychiatrist Dr. Callister. Dr. Callister acknowledged that the plaintiff suffered from a mental illness – paranoid-type schizoaffective disorder, visual hallucinations – but he stated that before prescribing any medication he wanted to review the plaintiff's medical records. Dr. Callister asked the plaintiff to sign forms allowing him to review his old medical records. The plaintiff alleges that Dr. Callister said he would see the plaintiff again in three weeks.

To obtain preliminary injunctive relief, a party must show that (1) his underlying case has some likelihood of success on the merits, (2) no adequate remedy at law exists, and (3) he will suffer irreparable harm without the injunction. *Wood v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007). If the moving parties demonstrates those three facts, the court must then balance the harm to each party and to the public interest from granting or denying the

injunction. *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013); *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999).

With regard to the plaintiff's first request for injunctive relief—the request that the court provide him with federal protection/special placement as a result of Mr. Love's threat--a preliminary injunction is appropriate only if it seeks relief of the same character sought in the underlying law suit and deals with a matter presented in that underlying suit. *Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997) (citing *De Beers Consol. Mines v. U.S.*, 325 U.S. 212, 220 (1945)); *see also Omega World Travel v. TWA*, 111 F.3d 14, 16 (4th Cir. 1997); *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.") (citing *Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975)); *Alston v. City of Madison*, 2014 U.S. Dist. LEXIS 106317, 2 (W.D. Wis. Aug. 4, 2014) ("[T]he general rule is that a plaintiff may not obtain injunctive relief on issues that do not relate to the claims asserted in the complaint."). The plaintiff's complaint alleges that the defendants have denied him adequate treatment for his mental health issues. The December 22 motion for injunctive relief relates to inmate Love's alleged threat, not to the mental health claims in the complaint. For that reason, the court will deny the December 22, 2014 motion for injunctive relief.

Turning to the plaintiff's January motion for emergency injunctive relief, the plaintiff has not shown a likelihood of success on the merits, especially in

11

light of the court's decision that he may not proceed *in forma pauperis* and must pay the full filing fee or face dismissal of the case. As the court has explained above, the evidence presented to the court in the last couple of months indicates that the plaintiff has received mental health care evaluation and treatment, and that he is not at risk of serious physical injury. For those reasons, the court will deny the January 5, 2015 motion for an emergency preliminary injunction.

B. <u>The Plaintiff's Motions to Compel Discovery</u>

On January 20, 2015, the plaintiff filed a motion to compel discovery (ECF No. 24). In that motion, he alleged that WCI staff member Carla Hartman denied his request for copies of 121 documents from the medical records that Dr. Callister obtained. He asks the court to order WCI to give him the records.

On February 23, 2015, the plaintiff filed another motion to compel discovery (ECF No. 28). It is difficult to tell exactly what the plaintiff requests in this motion, but as far as the court can tell, it appears that he is repeating his request that the court order WCI to produce copies of the medical records he asked for in the first motion to compel—he makes reference to cases about renewing motions. He states that Dr. Callister has received all of the records. He does indicate in this motion that on February 12, 2015, he was called to the Health Services Unit to review "medical mental records." He then talks about following policies for submitting disbursement and legal loan requests, leaving the court with the impression that he is arguing that he wasn't able to get personal copies of the records because he didn't have the money to pay for

copies. He asserts that these medical records would show that he is entitled to summary judgment.

On April 15, 2015, the plaintiff filed yet a third motion to compel discovery (ECF No. 41). While again it is difficult for the court to determine exactly what this motion alleges, the plaintiff appears to be asking again for copies of medical records, pointing out that the court's delays in responding to his various motions are causing him chronic mental suffering and distress. In this motion, he mentions interrogatories that he has served.

Under Federal Rule of Civil Procedure 37, a party may to file a motion to compel discovery where another party fails to respond to interrogatories or requests for production of documents. See Fed. R. Civ. P. 37(a)(3)(B)(iii) and (iv). The movant "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). The Eastern District's Civil Local Rule 37 requires the party to "recite the date and time of the conference or conferences and the names of all parties participating in the conference or conferences." The decision regarding whether to grant a motion to compel under Rule 37(a) is lies within the sound discretion of the trial court. *EEOC v. Klockner H & K Machines, Inc.*, 168 F.R.D. 233, 235 (E.D. Wis. 1996) (citation omitted).

The plaintiff mentions, on page 6 of his April 15 third motion to compel, the Rule 37 requirement that the parties meet and confer. He does not, however, clearly tell the court—in plain, straightforward language without legal

jargon—whether he conferred with any of the defendants about how he might get copies of the records he seeks, when he met with them, or who he met with. That is what the federal and local rules require.

At this point, however, because the court has revoked the plaintiff's authority to proceed *in forma pauperis* and stayed discovery until he pays the filing fee, plaintiff should not file any more discovery motions until he has paid that filing fee.

C. The Plaintiff's Motion for Summary Judgment

On February 9, 2015, the plaintiff filed a motion for summary judgment (ECF No. 25). He asks the court to order judgment against the defendants on his deliberate indifference claim because they do not provide him with mental health care for his mental illnesses. The court will not, given its decision requiring the plaintiff to pay the filing fee, rule on his summary judgment motion at this time. If the plaintiff pays the full filing fee, he may reinstate this motion simply by filing a one-sentence motion, asking the court to reinstate the February 9, 2015 motion for summary judgment. (The court does note that if the plaintiff pays the filing fee, and after that, asks the court in a one-sentence motion to reinstate the motion for summary judgment, this does not mean that the court will grant the motion. It will give the defendants the opportunity to respond to his motion, and give the plaintiff an opportunity to reply, before making any decision.)

D. <u>Motion Bringing to the Court's Attention the Fact That It Has Not Ruled on His Motions</u>

On March 20, 2015, the plaintiff filed a motion to bring to the court's attention the fact that he had not received any rulings on a number of his motions (ECF No. 38). It appears that what the plaintiff is really asking the court to do is to rule on the motions discussed above. In this order, the court has granted that request.

The court understands that the plaintiff would like the court to rule on his pleadings as soon as possible. The court attempts to consider every motion in every case filed before it in a timely fashion. The court also knows that the plaintiff suffers from mental health conditions, and that that is why he has filed this case. The court will tell the plaintiff, however, that he could make the court's job in reading, understanding and ruling on his motions much easier if he could state—in clear, plain language, without "[sic]" and "(undisputed)" and many, many lists of electronic court filing references—what it is he wants the court to do. If he pays the filing fee, and this case goes forward, the court strongly suggests that the plaintiff file short, clear, straightforward motions: "On X date, I asked defendant Y to give me the following five documents. Defendant Y has not given me those documents." A motion like that is much easier for the court to read, process and rule on than nineteen pages of dates and numbers and initials.

15

## Conclusion

The court **ORDERS** as follows:

The court **DENIES** the defendants' motion for reconsideration of Magistrate Judge Callahan's November 14, 2014 order granting authority to proceed *in forma pauperis*. (ECF No. 30).

The court **REVOKES** the plaintiff's authority to proceed *in forma pauperis*, in light of evidence presented after Judge Callahan issued his decision. The court **ORDERS** that, by **June 1, 2015**, the plaintiff shall pay in full the remainder of the filing fee **($399.47)**. If the plaintiff fails to pay the sum of $399.47 to the Clerk of Court by June 1, 2015, the court will dismiss the case.

The court **GRANTS** the defendants' motion to stay discovery and deadlines. (ECF NO. 36)

The court **DENIES** the plaintiff's December 22, 2014 motion for injunctive relief. (ECF No. 18)

The court **DENIES** the plaintiff's January 5, 2015 motion for emergency preliminary injunction. (ECF No. 20)

The court **DENIES** the plaintiff's January 20, 2015 motion to compel discovery. (ECF No. 24)

The court **DENIES** the plaintiff's February 23, 2015 motion to compel. (ECF No. 28)

The court **DENIES** the plaintiff's April 15, 2015 motion to compel discovery. (ECF No. 41)

The court **DENIES WITHOUT PREJUDICE** the plaintiff's February 9, 2015 motion for summary judgment. (ECF No. 25)

The court **GRANTS** the plaintiff's March 20, 2015 motion to bring certain facts to the court's attention, which the court construes as motion asking the court to rule on the prior motions. (ECF No. 38)

Dated at Milwaukee this 29th day of April, 2015.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Court Judge**