UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DWAYNE ALMOND,

                        Plaintiff,

        v.                                          Case No. 14-cv-901-pp

WILLIAM POLLARD, DR. BAIRD,
DR. ENDRES, DR. JOHNSON,
DR. LUDVEGSON, N. KAMPHUIS,
MR. NESBIT, WELCOME ROSE,
CHARLES FACKTOR, MATTHEW FRANK,
and KAREN GOURLIE,

                        Defendants.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 25) AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 73)

        The plaintiff, Dwayne Almond, is a prisoner representing himself. He filed this lawsuit alleging that the defendants deprived him of mental health care for his serious mental health needs since November or December 2013, in violation of his constitutional rights. Dkt. No. 1. The plaintiff has filed a motion for summary judgment, Dkt. No. 25, as have the defendants, Dkt. No. 73. For the reasons explained in this order, the court will deny the plaintiff's motion, grant the defendants' motion, and dismiss the case.

## I. FACTS[1]

### A. The Parties

The plaintiff was incarcerated at Waupun Correctional Institution (Waupun) at all times relevant to this case. Dkt. No. 76 at ¶1. He began his incarceration at Waupun on December 2, 2011. Dkt. No. 26 at ¶2.

Defendants Paul Ludvigson, Courtney Endres, Lesley Baird and Sandra Johnston were members of the Psychological Services Unit at Waupun at all times relevant. Dkt. No. 76 at ¶¶10, 12, 14, 16. Defendant Nicole Kamphuis is the Americans with Disabilities Act (ADA) coordinator at Waupun, and defendant Greg Nesbit was the backup ADA coordinator at the relevant time. Id. at ¶¶4-5. Defendants Welcome Rose, Charles Facktor and Karen Gourlie served as corrections complaint examiners, who investigate and respond to

---

[1]    The court takes facts from the Defendants' Proposed Findings of Facts. Dkt. No. 76. The plaintiff did not respond to the defendants' proposed facts. The defendants' facts are therefore undisputed. See Fed. R. Civ. P. 56(e)(2).
    The plaintiff also filed Proposed Findings of Facts. Dkt. No. 26. The defendants object to the plaintiff's facts generally, to the extent that they include allegations beyond the scope of the court's November 14, 2014, screening order (Dkt. No. 14), which permitted the plaintiff to proceed on claims that the named defendants failed to provide him with adequate mental health care beginning in November or December of 2013. Dkt. No. 75 at 1. In support of his proposed findings of fact, the plaintiff has submitted documents including portions of medical records dating back as far as 1987, depositions from prior litigation, and inmate complaints from prior years not at issue in this case. Id. The defendants object to the records to the extent that they are incomplete. Id. at 2. They also contend that the records and testimony predating the relevant timeframe are immaterial to any issues in this case. Id.
    The defendants request that the court "strike" the plaintiff's proposed facts that are not properly supported and/or material. The court will not "strike" these facts. Instead, the court will not consider facts that are not properly supported and/or material. The court will include in its discussion only material facts that are supported by admissible evidence. See Fed. R. Civ. P. 56(c)(1), (2); 56(e).

inmate complaints. Id. at ¶¶7, 9. Defendant William Pollard is the former warden at Waupun, and defendant Matthew Frank is the former secretary of the Department of Corrections. Id. at ¶¶2, 8.

B.  Psychological Services at Waupun

Waupun staff assign all Waupun inmates a primary clinician from the Psychological Services Unit (PSU). Id. at ¶31. At intake, staff members assess inmates and assign them one of the following mental health codes:

> MH-0: No mental health needs;
>
> MH-1: Acute or minor mental health need;
>
> MH-2: Presence of a serious mental illness;
>
> MH-2A: Serious mental illness such as schizophrenia or bipolar disorder; or
>
> MH-2B: Inmate has a personality disorder that seriously impairs his functioning such that he is in need of clinical monitoring.

Id. at ¶¶20-21.

PSU staff members see MH-0 inmates if those inmates request services or if they are imminently suicidal (in which case the clinician assigned to crisis duties for that day would see the inmate immediately). Id. at ¶24. Generally, clinicians do not see general population inmates with an MH-0 mental health rating unless such inmates submit a Psychological Services Request (PSR). Id. at ¶55. In that case, the clinician typically sees the inmate within three to six weeks, depending on that clinician's caseload, which could vary from 100-300 inmates. Id.

PSU staff members routinely see MH-1 and MH-2 inmates for wellness checks, and to assess their symptomatology and treatment needs. Id. at ¶26. Staff members monitor MH-1 inmates every six months while in general population, and MH-2 inmates every three months while housed in general population. Id. at ¶27.

In the segregation unit, PSU staff conduct routine rounds every one to two weeks, during which they approach inmates' cell fronts and speak with them to provide wellness checks and determine if the inmates need further treatment. Id. at ¶¶41, 43-44. Staff members see all inmates, regardless of mental health code, upon their arrival in segregation to assess their mental status and adjustment to segregation. Id. at ¶42.

C.     Psychological Care of the Plaintiff

Dr. Endres was the plaintiff's primary clinician from May 2013 to May 2014. Id. at ¶38. The plaintiff's mental health code was MH-0 during that time. Id. at ¶39.

Dr. Endres' initial contact with the plaintiff occurred on May 6, 2013, when the plaintiff was in the segregation unit. Id. at ¶40. That day, the plaintiff asked Dr. Endres to transfer him to the Behavioral Health Unit, a special unit at Waupun for chronically and severely mentally ill inmates. Id. at ¶47. The plaintiff insisted that he was schizophrenic, despite any overt manifestation of psychosis or any indication of such a diagnosis in recent records. Id. at ¶48. Dr. Endres informed the plaintiff that the plaintiff did not have a mental health

diagnosis and that he lacked any signs of psychosis, and that transfer to the Behavioral Health Unit would be inappropriate. Id. at ¶49.

A week later, on May 13, 2013, Dr. Endres arrived at the plaintiff's cell door for a brief check of mental status. Id. at ¶50. The plaintiff shouted a somewhat unintelligible statement about not wanting to speak with any "DOC people because [we] are all the same!" Id.

The plaintiff did not request any further mental health care until November 2013, when he submitted a psychological services request (PSR) from his cell in general population. Id. at ¶51. In the PSR, the plaintiff asked "to see the (Mental – Expert – Doctor), do[sic] to hearing-voices, and seeing unknowed [sic]– people – before – me?" Id. at ¶52. Waupun staff forwarded the PSR to Dr. Endres, who responded in writing, informing the plaintiff that the plaintiff would be "put on my schedule; it will be in 4-5 weeks." Id. at ¶¶53-54.

In December 2013, the plaintiff transferred into segregation status. Id. at ¶56. Dr. Endres checked on him during rounds on December 16, 2013, noting that the plaintiff appeared to be sleeping. Id. at ¶57. Ten days later, on December 26, 2013, Dr. Endres checked on the plaintiff again. Id. at ¶58. The plaintiff was awake and appeared to be writing something, but he would not respond when Dr. Endres called his name and knocked on his door. Id. On January 6, 2014, Dr. Endres tried again, and the plaintiff ignored her attempts to speak with him. Id. at ¶59.

In March 2014, the plaintiff was back in segregation, and Dr. Endres again attempted to speak with him. Id. at ¶61. When Dr. Endres approached

his cell, the plaintiff shouted, "I'm busy!" and would not further acknowledge her presence. Id. On April 14, 2014, Dr. Endres tried again. Id. at ¶62. The plaintiff was awake and appeared to be doing paperwork, but would not respond to her attempts to speak with him. Id. On April 28, 2014, Dr. Endres approached the plaintiff's cell door and the plaintiff yelled, "Get the f—k away from my door!" Id. at ¶63.

On May 5, 2014, Dr. Endres attempted to speak to the plaintiff at his cell and received the same result. Id. That same day, the plaintiff sent a PSR to the "Supervisor of PSU," asking for a transfer to the Wisconsin Resource Center, a facility for severely mentally ill patients, so that he could participate in a pre-release program. Id. at ¶¶64-65. Primary clinicians initiate transfers to this program, and a series of officials approves the transfers. Id. at ¶65. Officials typically permit transfers where the inmate has made efforts to participate in group or individual treatment at Waupun, and where the inmate requires additional, more intensive mental health treatment. Id. at ¶66. Officials require inmates who do not meet these specialized needs to use the pre-release services that Waupun's social work department offers. Id. at ¶67. Consequently, Dr. Endres denied the plaintiff's request, and suggested that he contact the social work department regarding pre-release programming. Id. at ¶68.

On May 12, 2014, Dr. Endres tried to speak with the plaintiff, who responded by yelling obscenities at her. Id. at ¶69. When Dr. Endres explained her presence at his cell, the plaintiff began screaming at her again. Id. The

following week, the plaintiff posted a sign on his door indicating that he did not wish to speak with PSU staff. Id. at ¶70. At some point after May 19, 2014, the plaintiff transferred to another PSU staff member, and Dr. Endres had no further involvement with him. Id.

Defendant Ludvigson was not the plaintiff's primary clinician, but he did provide the plaintiff care on an as-needed basis, and saw him during clinical rounds when his primary clinician was not available. Id. at ¶74. Ludvigson attempted to meet with the plaintiff during rounds on June 2, 2014. Id. ¶75. He noted that the plaintiff was upset because the psychiatrist had not seen him for medications. Id. During rounds on June 9, 2014, Ludvigson stopped to speak with the plaintiff at his cell front, and noted that the plaintiff wanted an appointment with the psychiatrist. Id. at ¶78. The plaintiff informed Ludvigson that he had stopped taking medication "years ago" and that he had previously taken Haldol. Id. Ludvigson advised the plaintiff to write to the psychiatrist if he wanted an appointment. Id. On June 23, 2014, during rounds, Ludvigson spoke with the plaintiff for clinical monitoring at his cell front. Id. at ¶79. The plaintiff asked Ludvigson if Ludvigson had told psychiatry that the plaintiff wanted medications, and Ludvigson told the plaintiff that Ludvigson had notified his clinician of his request for medications. Id. Ludvigson also informed the plaintiff that the plaintiff could write to Health Services Unit (HSU) for an appointment with the psychiatrist. Id.

In mid-May of 2014, Bonnie Halper (who is not a defendant in this case) became the plaintiff's primary clinician after Dr. Endres. Id. at ¶74. Halper saw

the plaintiff on clinical rounds nine times during the remainder of 2014. Id. at ¶81.

Halper saw the plaintiff in the group room in the segregation unit on November 5, 2014, for an individual session. Id. at ¶85. Halper noted that the plaintiff arrived calm, and was cooperative throughout their discussion about his mental health concerns. Id. The plaintiff indicated to Halper that he was sad/depressed at a 7/8 on a scale of 1 to 10, and that he had experienced depression since childhood. Id. Halper noted that the plaintiff stated that he had little energy and could focus his attention for only a few moments at a time. Id. The plaintiff also felt very stressed, and could tolerate the voices (in his head) for so long, but they become unbearable and his cellmates become irritated with him because he sometimes answered the voices, making the inmates think the plaintiff was talking with them, and at times took offense. Id. The plaintiff reported that he had been treated with Thorazine and Seroquel in the community and would get daily Haldol, but there were times he was given Haldol shots. Id. The plaintiff stated that he, his father and a cousin all were diagnosed with schizophrenia (paranoid type), and asked for a referral for psychiatry for the purpose of medication consideration. Id. Halper agreed to prepare a referral. Id.

Based on her examination, Halper found that although the plaintiff reported hearing voices, it actually might be intrusive thoughts, and she decided to conduct further assessment. Id. at ¶87. Halper diagnosed the plaintiff with Unspecified Depressive Disorder, Dysthymic Disorder, and a Hx

(history) of Schizophrenia. Id. at ¶88. She made a plan to change the plaintiff's level of mental health monitoring due to the referral for psychiatric care, and changed his mental health code to MH-1. Id. Defendant Baird reviewed and signed Halper's Psychological Services Clinical Contact note on December 1, 2014. Id.

On November 24, 2014, the plaintiff saw psychiatrist Todd Callister (who is not a defendant in this case). Id. at ¶90. Dr. Callister noted that the plaintiff did not present with a psychotic illness, and he did not prescribe any medication at that time. Id.

On December 18, 2014, Halper saw the plaintiff in response to his request to be seen. Id. at ¶91. Halper noted that the plaintiff reported that he felt "more than" depressed, yet she found that his affect appeared to express anger and agitation. Id. Halper further noted that the plaintiff indicated that he felt fearful and felt afraid of the voices that told him things like "he should kill himself, drink water out of the toilet, they'll kill you, or they're setting you up." Id. The plaintiff informed Halper that the hallucinations he saw involved "scary faces." Id. The plaintiff indicated that he had some concerns about transitioning to regular GP (general population), and said that he would like to participate in pre-release treatment. Id. The plaintiff spoke about not being seen by Dr. Callister and still not having medications; Halper encouraged him to send another PSR to HSU. Id.

Based on her exam, Halper maintained the plaintiff's MH-1 mental health code and diagnosis of Unspecified Depressive Disorder, Dysthymic

Disorder, and a history of Schizophrenia per PSU Records. Id. at ¶93. Halper noted that the plaintiff indicated that he wanted to participate in a pre-release and coping skills group, and that he agreed to complete a screen form for that group and return it to PSU. Id. Defendant Baird reviewed and signed Halper's Psychological Services Clinical Contact note on January 5, 2015. Id.

On January 15, 2015, Dr. Callister saw the plaintiff for a follow-up appointment, and observed that he did not believe any psychiatric treatment, including medication, was necessary. Id. at ¶94. Dr. Callister instead diagnosed the plaintiff as "malingering," with a history of personality disorder with narcissistic and antisocial features. Id.

The January 15, 2015 psychiatric report on the plaintiff indicated that "a review of his chart and numerous providers have come to the conclusion that the patient is malingering symptoms . . . ," and further that "he has been incarcerated since 2005 and reports from psychology staff have consistently noted an absence of any evidence of psychotic symptoms." Id. at ¶95. The psychiatrist concluded with the diagnoses of malingering and a "history of personality disorder with narcissistic and antisocial features." Id.

On January 22, 2015, defendant Ludvigson attempted to meet with the plaintiff, who glared at him and said, "All you honkeys keep your honkey asses away from my door." Id. at ¶97. Ludvigson performed a limited mental health status evaluation, and observed that the plaintiff's mental health status was within normal limits. Id. Ludvigson then made a treatment plan, which specified that the plaintiff would be seen routinely during clinical rounds in

segregation based on the clinical monitoring schedule, and as he requested. Id. at ¶98. Baird reviewed and signed Ludvigson's plan. Id.

Ludvigson attempted to speak with the plaintiff for clinical monitoring on April 13, 2015, after the plaintiff was placed in temporary lockup for assault. Id. at ¶99. The plaintiff refused the visit, stating, "Get the fuck away from my door with that hoe-ass shit! Sick ass fags!" Id. Ludvigson maintained the plaintiff's MH-1 mental health code and made a plan to have him seen routinely by his clinician during clinical rounds, and as requested. Id. Ludvigson had no further involvement in the mental health care of the plaintiff after April 13, 2015. Id. at ¶100.

PSU staff continued to try to engage the plaintiff for treatment during clinical rounds, but he refused to cooperate with staff efforts. Id. at ¶101. Specifically, PSU staff members attempted to speak with the plaintiff, and were rebuffed, during clinical rounds on: January 26, 2015; February 5, 2015; February 10, 2015; February 17, 2015; February 23, 2015; April 20, 2015; April 27, 2015; May 5, 2015; May 18, 2015; May 26, 2015; June 1, 2015; June 8, 2015; July 6, 2015; July 14, 2015; July 20, 2015; July 27, 2015; August 3, 2015; and August 17, 2015. Id. at ¶102.

Baird had no further involvement in the plaintiff's mental health care after March 20, 2015. Id. at ¶103. Baird did not provide direct mental health care to the plaintiff from November, 2013 until her departure from Waupun in March 2015. Id. at ¶104. Her only involvement consisted of her supervision, as the PSU Supervisor, of the plaintiff's mental healthcare. Id.

Defendant Johnston was not the plaintiff's primary clinician from November 2013 until she left Waupun in January 9, 2015. Id. at ¶105. Johnston has no knowledge of, nor was she ever personally involved in, any decisions related to the plaintiff's mental health care from November 2013 until January 9, 2015. Id. at ¶106. She had no involvement regarding the plaintiff's mental health care since November 2013. Id.

D.     ADA Coordinator

Each DOC institution appoints an ADA Coordinator. Id. at ¶116. The ADA Coordinator, in conjunction with HSU, determines whether an inmate needs an ADA accommodation. Id. at ¶117. Defendant Kamphuis's duties include determining the appropriateness of the requested accommodation to ensure that individuals with disabilities could access and use services, programs, and activities, such as school, recreation, canteen, etc. Id. at ¶119.

Defendant Nesbit did not review and/or respond to any Reasonable Modification/Accommodation Request from the plaintiff regarding mental health care since November 2013 to his retirement from state service. Id. at ¶120. Nesbit does not recall any conversations with the plaintiff regarding mental healthcare since November 2013 to his retirement from state service. Id. at ¶121.

The plaintiff submitted to Kamphuis a Reasonable Modification/Accommodation Request (Form DOC-2530) dated June 9, 2014, stating:

> I, Mr. Dwayne Almond, #238839-A, have been ["sic"];
> "mental health treatment; for; hearing voices/inside my-

12

> head"; and I have continuously hallucinations.' Despite, inmate Dwayne Almond #238839-A has been ("deprived"): of any-adequate mental health care or treatment since: December 2, 2011 or ("transferred") from: GBCI, to: WCI? Inmate Almond #238839-A, has ["sic"]; "history – schizophrenia – or – schizoaffective – paranoid – type, ("chronic"): mental health are – record's / since: "early's – 1990's?" / (See / Exhibit's ## 70, - 80, of: (6), pages – mental – health – records?

Id. at ¶122. On June 11, 2014, Kamphuis informed the plaintiff that his request did not describe a modification and/or accommodation. Id. at ¶123. Kamphuis asked the plaintiff if he sought a specific accommodation under the ADA. Id. at ¶124. She informed the plaintiff that his complaint about the deprivation of adequate mental health care was not an ADA issue, and advised him to speak with PSU or HSU staff about any problems with his treatment. Id. at ¶125.

On June 12, 2014, the plaintiff sent an Interview/Information Request to Kamphuis, stating:

> . . . you Ms. N. Kamphuis states that I didn't describe a modification and/or accommodation that you are requesting. Fact's of ["sic"]; Modification and accommodation, is the "DOC. – Psychiatrists/ Psychologists, of ("WCI"), saying I'm a ("M/H0")! And don't need any treatment for mental – medications!

Id. at ¶126. In response, on June 13, 2014, Kamphuis informed the plaintiff that he should notify the PSU if he did not believe his treatment was adequate, and reiterated that he had not raised an ADA issue. Id. at ¶127. Kamphuis denied the plaintiff's request. Id. at ¶128.

On June 24, 2014, the plaintiff submitted a Reasonable Modification/Accommodation Request to Kamphuis, stating:

> 1.) I, Mr. Dwayne Almond, #238839-A, has been ["sic"]; "Diagnosed with: Paranoid – type schizophrenia/ schizoaffective, and continuously hallucinations?"; ("Identify above disabilities"). Despite the ("PSU-clinical of WCI") has said I am "no longer ["sic"]; "mentally ill?"; and – for that reason I'm not qualified for any mental medications/for "hearing chronic voices/hallucinations?; or have the right to access any mentally ill/program/service/activities – herein ("WCI")
>
> 2.) "Health Service Unit ("HSU"), has also said they not gone to respect my: physical – disabilities of: lower back, lower-abdomen-left-side/chronic-pain-in fingers/leg"? or *And I'm not qualified for any-physical-ill/chronic-med's/have to access ("P/S/C?)

Id. at ¶129.

On June 25, 2014, Kamphuis denied the plaintiff's request, advising him that this is not an ADA issue, and that he should work with PSU and HSU. Id. at ¶130.

The plaintiff submitted an Interview/Information Request dated June 25, 2014, stating:

> . . . This is your "second time-denied-my-requests for: "Reasonable Modification/Accommodation/request- ("ADA"). On 6-24-14; it stated my: ADA-Coordinator-issues; ["sic"]; "DOC is "depriving" me from "mental/physical-programs,/service/and activity, which I'm qualified for?; with respect of my: ["sic"]; "disabilities impairment?" Qualified to be protected ADA?"

Id. at ¶131. On June 26, 2014, Kamphuis informed the plaintiff that if he disagreed with her decision he could appeal it by filing an inmate complaint. Id. at ¶132.

The plaintiff submitted a Reasonable Modification/Accommodation Request to Kamphuis dated June 29, 2014, stating:

> I, Mr. Dwayne Almond, #238839-A, has a ["sic"]; "disability called schizophrenia or schizoaffective-paranoid-type?/continuously hallucinations!"; By: ("History"), since the/early's-1990's." "On May 4, 2014, I asked or requested that Dr. Endres,/refer: Inmate Dwayne Almond #238839-A, to the ["SIC"];" WRC's pre-release program?"; she stated: I'm currently coded as an ("MH0"), and thus would not be appropriate for "mental health programming?" ("dispute"). ("Also: Dr. Manlove,/Belinda Schrubbe ("HSU"), has "denied" inmate Almond #238839-A-an-physical-("MRI") that's needed to determined serious need of: surgeries/of-a-untreated/ ("diagnosed-hemorrhoid?")

Id. at ¶133.

On July 2, 2014, Kamphuis denied the plaintiff's request, noting that he did not seek an accommodation that she could grant, and informing him that she would forward the information to PSU and HSU. Id. at ¶134. Kamphuis then stated that the ADA Coordinator did not make placement referrals, nor could she diagnose inmates. Id.

Kamphuis then emailed PSU Supervisor Baird and HSU Manager Belinda Schrubbe regarding the plaintiff's requests/issues. Id. at ¶135. She denied the requests because the plaintiff again was complaining regarding treatment that should be addressed by a mental health treatment provider. Id.

As the ADA Coordinator and secondary ADA Coordinator, Kamphuis and Nesbit do not make psychological or mental health treatment decisions. Id. at ¶138.

E.      Inmate Complaint

The plaintiff filed Offender Complaint WCI-2014-505, which the inmate

complaint examiner (ICE) received on January 7, 2014. Id. at ¶139. The

plaintiff stated:

> On the above date of January 2, 2014, I inmate Dwayne
> Almond #238839-A, after a first request of seeking
> ("Mental Health Care of Treatment"). Which the
> "Supervisor of PSU," received my first requested backin'
> early / November, 2013; Placed "me" on the listed to be
> seen by the ("Psychiatrist Expert-Doctor"), within (5) five-
> week's? – For: Hearing Voices and seeing-things
> ("Schizophrenia – Paranoid") has started back up?
> "Despite, I inmate Dwaye Almond #238839-A, has never
> been called to see the (Psychiatrist-Expert-Doctor")? "So I
> forwarded a "Second" request of seeking "Mental Health
> Care of Treatment," to the "Supervisor of PSU,-regarding:
> "Hearing Seriously Threatening Voices telling "me" – bad
> things to do," that's very disstressful and painful!" I have
> continually been ("Deprived"), of ("Mental-Treatment?"),
> ("Undisputed") (under 28 U.S.C. § 1746")

Id.

The ICE, Jim Muenchow (who is not a defendant in this case),

investigated the plaintiff's complaint. Id. at ¶140. His ICE Report states in

relevant part:

> Dr. Endres has been contacted regarding the claims made
> in the complaint. Inmate Almond is an M/H 0. She did
> confirm that in early November she advised inmate
> Almond she would make contact with him within a 5-
> week period. Inmate Almond was in GP status at the time.
> On the 5th week, inmate Almond was placed in TLU
> status (12/12/13) so a pass could not be issued. Given
> that, Dr. Endres attempted to interview him during SEG
> Clinical Rounds on 12/16/13. Inmate Almond appeared
> to be sleeping and did not respond to clinician's attempts
> to engage him. Dr. Endres attempted twice more to
> interview inmate Almond, 12/26/13 and 1/6/14. Inmate

was awake and appeared to be writing something. He would not respond to Dr. Endres' attempts to engage.

It is clear from the information provided by Dr. Endres that nobody is ignoring inmate Almond's requests for PSU consultation. If he desires to have his concerns addressed, he must cooperate with his assigned clinician.

Id. at ¶¶140-42; Dkt. No. 80-2 at 7. On January 29, 2014, based on his findings, Muenchow recommended dismissal of WCI-2014-505. Dkt. No. 76 at ¶142.

On February 3, 2014, DOC Psychology Director Gary Ankarlo (who is not a defendant in this case) issued a "Reviewer's Decision" on WCI-2014-505. Id. at ¶143. Dr. Ankarlo stated:

WCI-PSU has documented there [sic] attempts to interview Mr. Almond and it is clear that he refused to cooperate. Mr. Almond is currently classified as an MH-0, indicating that he has no current mental illness. There is no evidence to suggest that the classification is in error beyond Mr. Almond's claims.

Id.; Dkt. No. 80-2 at 8. Based on his findings, Dr. Ankarlo accepted Muenchow's recommendation and dismissed Offender Complaint WCI-2014-505. Dkt. No. 76 at ¶143.

The plaintiff appealed this decision to the corrections complaint examiner's office. Id. On February 7, 2014, Charles Facktor recommended that the appeal be dismissed. Id. at ¶144. Facktor noted that the institution's decision reasonably and appropriately addressed the plaintiff's issue and that, on appeal, he presented no information to warrant a recommendation overturning that decision. Id.

On February 24, 2014, Gourlie sent a letter to the plaintiff notifying him that under §DOC 310.14(1), Wis. Adm. Code, Deputy Secretary Morgan (who is not a defendant in this case) had extended the time for deciding this appeal for cause, effective February 21, 2014. Id. ¶145. Based on the findings and recommendation of the CCE, the Secretary's Designee, Cindy O'Donnell dismissed Offender Complaint WCI-2014-505 on February 26, 2014. Id. at ¶146.

F.    Warden Pollard

Pollard does not recall any conversations with the plaintiff regarding his complaints of denial of adequate mental health care and treatment. Id. at ¶152.

The plaintiff submitted an Interview/Information Request dated October 22, 2014, addressed to Pollard and the PSU Supervisor. Id. at ¶153. The plaintiff stated "On: 10/20/14? ["sic"]; "deprived inmate or plaintiff – Dwayne Almond #238839-A, of: Any-Adequate mental health/care treatment?; suffering from: "hearing voices, - and – hallucinations . . . , / he need ("psyhotropic medications")." Id.

Pollard's practice was to forward inmate correspondence stating concerns of conditions and care to the appropriate department for review and response. Id. at ¶154. In this case, Pollard would have forwarded the plaintiff's correspondence regarding concerns of inadequate mental health care to the PSU Supervisor for response. Id. at ¶155. Because this request also was addressed to the PSU Supervisor, Pollard would have relied on the PSU Supervisor to address the plaintiff's concerns. Id.

18

On July 19, 2015, the plaintiff sent Pollard a "Notice" that he would be facing criminal charges for:

> continuously permitting misconduct of criminal act's of intentional abuse, taunting prejudices and ("depriving – Almond's – serious needed – physical/mental – adequate – treatment – care; that's been personal .../ lefted untreated on-gone, / since; December 2, 2011 – through – July, 2015" and "continuously misconduct, retaliation, abuse, taunting, and criminal intentional acts.../ against Plaintiff Dwayne Almond #238839" and that Pollard was the "leading – crooked – state – DOC – employed; -that's involved in – Almond's – Cases No. – 14-cv-901-PP; No. 15-cv-365-PP, - No. 15-cv-568-PP?; as a defendant in all – (3) three....

Id. at ¶156. Pollard does not believe that the plaintiff was asking him to intervene in his mental health care in this notice. Id. at ¶157.

On August 5, 2015, the plaintiff submitted an Interview/Information Request to Dr. Bonnie Halper, Dr. Callister, Dr. Baird and Pollard. Id. at ¶158. In his request, the plaintiff stated, "I received a "Letter" from you / dated: 8/3/2015, that's so "untruthful"; despite your - - misconduct of mental abuse, taunting – to: Almond #238839-A; that you have - - permitted for the "Defendants' involved of case over?" Id. Dr. Halper responded to the plaintiff's Interview/Information Request by informing the plaintiff that if he would like to engage in mental health treatment, he should send a Psychological Services Request. Id. at ¶159.

The plaintiff submitted an Interview/Information Request dated August 10, 2015, addressed to Dr. Bonnie Halper, Dr. Baird and Pollard. Id. at ¶160. In his request, the plaintiff alleged "criminal act's of misconduct, abuse, taunting... / Almond's #238839-A, - mental illness . . . , that's left untreated

on-gone . . ." Id. Dr. Halper responded to the plaintiff's Interview/Information Request informing him that his concerns had been noted. Id. at ¶161.

Although Pollard had the general supervisory authority over Waupun operations as provided in the Wisconsin Statutes, he did not supervise the day-to-day operations of individual employees in each department. Id. at ¶162.

## II.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

    B.    <u>Parties' Arguments</u>

        1.    *Plaintiff's Arguments*

The plaintiff contends that the court should grant his motion for summary judgment because the defendants unlawfully failed to provide him with mental health care for his mental illnesses, which included "paranoid-type schizoaffective disorder, chronic-depression, and visual hallucinations." Dkt. No. 25 at 2. The plaintiff focused on his November 6, 2013 PSR, in which he stated that he was hearing voices and having hallucinations. According to the plaintiff, Dr. Endres told him that he was scheduled to be seen within five weeks, but the plaintiff was never scheduled to be seen with a psychiatrist or psychologist. <u>Id.</u> at 4.

The plaintiff asserts that he has a history of over thirty years of mental health records, going back to 1987 at Mendota Mental Health Institute. <u>Id.</u> at 5. He also cites to a 1992 Wisconsin Department of Corrections clinical services report. <u>Id.</u> The plaintiff asserts that he collected Social Security Disability since 1997 for suffering from "seriously chronic distressful 'mental illnesses'" and that he received "psychotic mental medication" from Wisconsin Community Services during 2004 and 2005. <u>Id.</u> at 8.

The plaintiff states that he has offered "expert testimony" as to his mental illnesses. Id. at 11. He cites to the 2007 deposition transcripts of Dr. Janet Walsh, Dr. Michael Vanden Brook, Gregory Grams, Dr. Dana Diedrich and Dr. Bret Reynolds, from Almond v. Grams, Case No. 06-C-0451-C (W.D. Wis.). Id. at 11; Dkt. No. 27-3; Dkt. No. 27-4. The plaintiff interprets these filings as undisputed evidence of his mental illnesses, and asserts that he has been diagnosed with, and is suffering from, mild mental retardation, chronic paranoid schizophrenia or schizoaffective psychosis, antisocial personality disorder and chronic depression. Dkt. No. 25 at 11-12.

### 2. Defendants' Arguments

In their summary judgment motion, the defendants contend that (1) the court should grant summary judgment to Matthew Frank, against whom the plaintiff makes no claims (dkt. no. 74 at 10); (2) the court should grant summary judgment to Welcome Rose, Charles Facktor and Karen Gourlie because denying an inmate's complaint does not violate the Constitution (id. at 11); and (3) the court should dismiss defendants Nicole Kamphuis, Greg Nesbit, Sandra Johnston, Lesley Baird and William Pollard, because they lacked personal involvement in the plaintiff's treatment (id. at 13). The defendants also contend that the plaintiff cannot state a claim for deliberate indifference to a serious medical need against the remaining defendants, Dr. Courtney Endres and Paul Ludvigson. Id. at 18. According to the defendants, the plaintiff did not suffer from a serious medical need. Id. at 19. They also contend that the record establishes that the plaintiff repeatedly refused mental

health treatment offered to him, and therefore cannot establish that any defendant acted with deliberate indifference to his needs. Id. at 20.

In response, the plaintiff contends that two "expert psychiatrists" recently put him back on Holdol[2] for his chronic mental illness. Dkt. No. 95 at 2. The plaintiff asserts that on April 4, 2016, a psychiatrist at the P.A.T.H. Program in Memphis, Tennessee, prescribed him 10 mgs. of Holdol. Id. In addition, the plaintiff states that on May 18, 2016, a psychiatrist at the Milwaukee Secure Detention Facility prescribed him 10 mgs. of Holdol for his serious mental health needs. Id. at 3. The plaintiff also states that these "new expert psychiatrists" stated that the Waupun defendants involved in this case were very wrong for not giving the plaintiff Haldol for his serious mental illnesses. Id. The plaintiff also states that these individuals are willing to testify on his behalf. Id.

C.    Discussion

1.    *Deliberate Indifference Standard*

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (quoting Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009)); see also Estelle v. Gamble, 429 U.S. 97, 103 (1976)).

---

[2] Haloperidol (Haldol) is an antipsychotic medicine. It works by changing the actions of chemicals in the brain. Haloperidol is used to treat schizophrenia. It is also used to control motor and speech tics in people with Tourette's Syndrome. https://www.drugs.com/search.php?searchterm=haldol (last visited August 21, 2016).

"Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." Arnett, 658 F.3d at 750 (citing Estelle, 429 U.S. at 104). "[A] claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." Arnett, 658 F.3d at 750 (citation omitted). "[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." Rodriguez, 577 F.3d at 828 (quoting Estelle, 429 U.S. at 104).

The need for a mental illness to be treated may be considered a serious medical need if it could result in significant injury, such as death by suicide, or the unnecessary and wanton infliction of pain. Sanville v. McCaughtry, 266 F.3d 724, 734 (7th Cir. 2001); see also Glick v. Walker, 272 Fed. App'x 514, 519 (7th Cir. 2008) (mental illnesses that require treatment are serious medical needs under the Eighth Amendment).

To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011). A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate, and either acts or fails to act in disregard of that risk. Id. A prison official cannot be found liable under the Eighth Amendment unless the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference.'" Gutierrez, 111 F.3d at 1369 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" Arnett, 658 F.3d at 751 (quoting Collignon v. Milwaukee Cnty., 163 F.3d 982, 988 (7th Cir. 1998)). Deliberate indifference does not, however, include medical malpractice; "the Eighth Amendment does not codify common law torts." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008) (citation omitted).

Establishing deliberate indifference under the subjective prong is a high standard; medical malpractice is insufficient, as is a mere disagreement with a medical professional's medical judgment. See Estelle, 429 U.S. at 106; Arnett, 658 F.3d at 751. "A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, 'no minimally competent professional would have so responded under those circumstances.'" Id. (quoting Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011)).

The court will focus on whether the defendants acted with deliberate indifference.

### 2. *Doctors Endres and Ludvigson*

Because Dr. Endres and Dr. Ludvigson are medical professionals, the court can find that they acted with deliberate indifference only if their treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards . . . as to demonstrate" that they were not relying "on a professional judgment." Youngberg v. Romeo, 457 U.S.

307, 323 (1982) (internal quotation marks and citation omitted); <u>Sain v. Wood</u>, 512 F.3d 886, 894-95 (7th Cir. 2008). Conduct that is akin to criminal recklessness—but not medical malpractice or negligence—violates the Eighth Amendment. <u>Farmer</u>, 511 U.S. at 836-39.

The undisputed factual record establishes that PSU staff determined that the plaintiff did not suffer from paranoid schizophrenia during the relevant time. The undisputed facts also show that Waupun psychological staff regularly checked on the plaintiff during 2013, 2014 and 2015, and that the plaintiff repeatedly refused psychological care—from Dr. Endres in particular.

The plaintiff's submissions from prior lawsuits do not establish that he suffered from paranoid schizophrenia or schizoaffective disorder during the timeframe he alleges in this case. Even if the plaintiff had submitted evidence that he currently suffers from paranoid schizophrenia/schizoaffective disorder, such evidence would not prove that the defendants acted with deliberate indifference.

The plaintiff disagrees with the defendants' determination that he did not suffer from paranoid schizophrenia or schizoaffective disorder, as well as with their treatment protocols. The plaintiff insists that he has paranoid schizophrenia/schizoaffective disorder. He would have liked to have been transferred to the Wisconsin Resource Center and prescribed medication for that diagnosis. Dr. Endres, Bonnie Halper and Dr. Callister all determined, however, that the plaintiff did not have paranoid schizophrenia or schizoaffective disorder.

Disagreement with a course of treatment does not give rise to an inference that prison medical staff acted with deliberate indifference to a prisoner's needs. Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010); Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir. 2003). The record does not support a finding that Dr. Endres' or Dr. Ludvigson's actions were a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Estate of Cole v. Fromm, 94 F.3d 254, 262 (7th Cir. 1996). A reasonable factfinder could not conclude that they acted with deliberate indifference to the plaintiff's mental health needs.

3.    *Kamphuis, Nesbit, Johnston, Baird, Pollard, Rose, Facktor and Gourlie*

Only a defendant who is personally responsible for depriving the plaintiff of a constitutional right may be held liable under 42 U.S.C. §1983. Grieveson v. Anderson, 538 F.3d 763, 778 (7th Cir. 2008). If someone else has committed the act that resulted in the constitutional deprivation, a defendant is personally responsible, and thus liable under §1983, only if he knows about the other person's act and has a realistic opportunity to prevent it, but deliberately or recklessly fails to do so. Lewis v. Downey, 581 F.3d 467, 472 (7th Cir. 2009).

Even if the plaintiff had established a constitutional violation, the remaining defendants lacked direct personal involvement in his mental health care at Waupun. The record does not support a finding that Baird, Johnston,

Pollard, Kamphuis, Nesbit, Rose, Facktor, Gourlie[3] or Frank[4] acted with deliberate indifference to the plaintiff's mental health needs. Thus, the court will grant the defendants' motion for summary judgment as to these defendants.

## III.  CONCLUSION

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 25.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 73.

The court **ORDERS** that this case is **DISMISSED**.

Dated In Milwaukee, Wisconsin this 30th day of August, 2017.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**

---

[3] The court agrees with the defendants that the fact that Rose, Facktor and Gourlie denied his inmate complaints does not constitute a constitutional violation. In its screening order, however, the court allowed the plaintiff to proceed on only one claim—deliberate indifference to serious medical need. Because these defendants were not involved in any respect with any decisions regarding the plaintiff's medical care, the court need not go into a detailed discussion of the law on complaint examiner liability under §1983.
[4] The court agrees that the plaintiff made no claims at all against defendant Frank.